UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | |
| ISAIAH RIEVES, | * | Criminal Action No. 19-cr-10445-ADB |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

BURROUGHS, D.J.

On November 20, 2019, a grand jury returned an indictment charging Isaiah Rieves ("Defendant") with: distribution of 40 grams or more of fentanyl and other controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi) (Count One); possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) (Count Two); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Three); and possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count Four). [ECF No. 14 at 1]. Currently pending before the Court is Defendant's motion to suppress evidence obtained by police through GPS monitoring of a vehicle Defendant was using and a search of his home. [ECF No. 48]. For the reasons set forth below, the motion to suppress, [ECF No. 48], is DENIED.

## I. BACKGROUND

The following facts are drawn from the affidavits of Drug Enforcement Agency ("DEA") Special Agent Melissa Gillen ("Gillen"), which were used to obtain the two warrants at issue. [ECF Nos. 48-1, 48-3].

On October 9, 2019, Gillen submitted an application for an order authorizing the installation, use, and monitoring of a GPS device on a 2009 gold Chevy Tahoe believed to be used by Defendant. [ECF No. 48-1 ¶ 12]. The application also requested permission to enter the curtilage surrounding 75 Seymour Avenue in Lynn, Massachusetts in order to install the GPS device on the vehicle. [Id. ¶ 13]. In support of probable cause, Gillen stated that the DEA began investigating Defendant after a controlled buy from a confidential source ("CS") in August 2019. [Id. ¶¶ 16–17]. The CS agreed to cooperate with the DEA after a search of his/her residence pursuant to a warrant on October 1, 2019 revealed a collection of drugs in significant quantities, including cocaine, fentanyl, ecstasy, and methamphetamine. [Id. ¶¶ 18–19]. The CS identified his/her supplier as a black male known as "Unk/Unc," and said they had met one and a half years prior. [Id. ¶ 19]. The CS said that "Unk" lived in Lynn and drove a gold Chevy Tahoe, that the two communicated via text message, and he/she also provided a phone number for "Unk." [Id.]. Further, he/she detailed the types of drugs "Unk" supplied, including several of the types found in the CS's residence, and said that "Unk" typically supplied him/her with drugs and then collected payment at a later date. [Id.]. Investigators later identified "Unk" as Defendant. [Id.].

On October 2, 2019, the CS contacted Defendant under the direction and supervision of investigators and told him that he/she wanted to meet to "re-up" later that day. [ECF No. 48-1 ¶ 20]. Defendant agreed to meet. [Id.]. Prior to the meeting, investigators searched the CS's vehicle, found nothing, and wired the CS so that the audio of the meeting would be transmitted to law enforcement and recorded. [Id.]. At approximately 9:26 p.m., investigators saw a gold Chevy Tahoe, driven by a black male, arrive and park at the location where the CS and Defendant had agreed to meet. [Id. ¶ 21]. The CS received a text from Defendant and then drove his/her vehicle to the meeting location while being followed by investigators. [Id.]. The

CS parked near the gold Chevy Tahoe and entered the vehicle. [Id.]. After several minutes, the CS got out of the Tahoe and removed a box from the back. [Id. ¶ 22]. The CS then got into his/her own vehicle with the box and drove, while under surveillance, to meet investigators. [Id.]. Inside the box, investigators found various pills and powders, all of which were believed to be controlled substances including fentanyl, cocaine, and ecstasy. [Id.]. After the meeting, other investigators followed Defendant, still driving the gold Chevy Tahoe, back to Lynn. [Id. ¶ 23]. State investigators commenced a traffic stop and saw that Defendant's license pictured him and listed his address as 75 Seymour Avenue in Lynn, Massachusetts. [Id.]. After the traffic stop, investigators continued to follow Defendant as he drove to that address, parked, and walked towards the residence. [Id.]. Gillen stated that based on her training, experience, and the information above, she believed Defendant was using the gold Chevy Tahoe to facilitate drug trafficking. [Id. ¶ 24].

Gillen sought a second warrant on October 23, 2019, this time to search Defendant's residence at 75 Seymour Avenue in Lynn. [ECF No. 48-3 ¶¶ 10–11]. To establish probable cause, Gillen recited the facts above. [Id. ¶¶ 13–20]. In addition, the affidavit referenced GPS data showing that Defendant returned to the 75 Seymour Avenue residence each night, that he had been observed entering the residence, and that he had returned to that location after the controlled buy. [Id. ¶ 21]. Gillen also stated that on October 22, 2019, Defendant contacted the CS and requested payment for the drugs that the CS had received from Defendant during the October 2 controlled buy. [Id.]. The CS agreed to provide a partial payment and, that evening, GPS data showed Defendant traveling to the CS's house and then to his/her parents' house, where Defendant drove past their house several times before parking outside. [Id.]. Defendant tried contacting the CS several times, then left and returned to 75 Seymour Avenue. [Id.]. Later

that day, Defendant spoke with the CS and said that he would return to collect payment the following evening. [Id.].

As further support, Gillen stated that, based on her training and experience, "it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences . . . ." [ECF No. 48-3 ¶ 23]. She also said she had participated in several searches of the residences of traffickers whose criminal activity was similar to Defendant's, and that drug related evidence had typically been recovered during those searches. [Id.]. The affidavit included several pages further detailing her experience and describing what was typically found in traffickers' residences. [Id. ¶ 23(i)–(x)]. Because GPS data and surveillance had shown Defendant driving back and forth to the 75 Seymour Avenue location and returning every night—including after the October 2 controlled buy and the October 22 attempt to obtain payment from CS—Gillen stated that she believed that the location was Defendant's residence, that he was using the location to further his drug trafficking activities, and that evidence of those activities was likely located at the address. [Id. ¶¶ 26–27].

## II.     LEGAL STANDARD

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element." United States v. Rodrigue, 560 F.3d 29, 32–33 (1st Cir. 2009) (quoting United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005)). "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found at a particular place.'" United States v. Torres-Rosario, 588 F. Supp. 2d 128, 131 (D. Mass. 2008) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). "Information supporting probable cause for a warrant is often set forth in an affidavit provided by a law

enforcement officer . . . ." United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013). "An affidavit supporting a search warrant is presumptively valid," id., and "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v United States, 393 US 410, 419 (1969)). A reviewing court's "duty is simply to ensure that the magistrate [judge] had a substantial basis for . . . conclud[ing] that probable cause existed." United States v. Bregu, 948 F.3d 408, 417 (1st Cir. 2020) (citations and quotation marks omitted).

"[I]t is well-established that '[i]n determining the sufficiency of an affidavit, [courts] consider whether the totality of the circumstances stated in the affidavit demonstrates probable cause to search the premises.'" United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011) (quoting United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002)). "Where the finding of probable cause depends on information supplied by an informant, courts review that determination in light of" several factors. Torres-Rosario, 588 F. Supp. 2d at 131. These may include:

> whether an affidavit supports the probable "veracity" or "basis of knowledge" of persons supplying hearsay information; whether informant statements are self-authenticating; whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and whether a law enforcement affiant included a professional assessment of the probable significance of the facts related by the informant based on experience or expertise.

United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996); Tiem Trinh, 665 F.3d at 10 (stating that factors are "non-exhaustive"). "None of these factors is indispensable; thus, stronger evidence on one or more factors may compensate for a weaker or deficient showing on another." Zayas-Diaz, 95 F.3d at 111.

5

## III.   DISCUSSION

Defendant argues that evidence seized in connection with both warrants should be suppressed because the affidavits did not establish probable cause. [ECF No. 48 at 6]. In addition, Defendant specifically states that the October 23 affidavit seeking a warrant to search Defendant's home lacked probable cause because it did not establish a nexus between the residence and the alleged drug trafficking. [Id. at 6–7]. The Government contends that the affidavits provided sufficient support for a finding of probable cause and that the October 23 affidavit established a sufficient nexus between the residence and drug trafficking. [ECF No. 51 at 5, 11].

### A.   Probable Cause

Defendant mischaracterizes the affidavits by claiming that they rely "on largely uncorroborated information from an unreliable informant." [ECF No. 48 at 7].

First, the affidavits did not rely primarily on the CS's information, but also included information and details corroborated by investigators which helped establish the CS's reliability. This case is unlike United States v. Gifford, cited by Defendant, in which "[t]here was no independent police surveillance . . . that could enhance the reliability of the informant's tip." 727 F.3d at 100. Here, investigators were able to corroborate and confirm the reliability of the CS's information by supervising the CS's phone call to Defendant and the subsequent controlled buy, all of which allowed investigators to confirm that the CS had provided accurate information concerning Defendant's phone number, city of residence, and car. [ECF No. 48-1 ¶¶ 20–23; ECF No. 48-3 ¶¶ 17–20]. The controlled buy, surveilled by law enforcement, resulted in the

seizure of drugs from Defendant's car. [ECF No. 48-1 ¶¶ 20–22; ECF No. 48-3 ¶¶ 17–19].[1] This established probable cause to believe that GPS data about where Defendant traveled could provide information about where he might be storing the drugs and other materials (e.g., cash, records) related to his drug trafficking activities.

In addition, the drugs Defendant sold during the controlled buy matched the types of drugs (fentanyl, cocaine, ecstasy) found in the CS's apartment and identified by the CS as having been purchased from Defendant in the past. [ECF No. 48-1 ¶ 18, 22; ECF No. 48-3 ¶ 16, 19]. The CS had also told investigators that he/she usually picked up drugs from Defendant but then paid Defendant at a later time, which was confirmed through the controlled buy and Defendant's later attempts to obtain payment from the CS. [ECF No. 48-1 ¶ 19; ECF No. 48-3 ¶¶ 16, 21]. Finally, the traffic stop provided investigators with Defendant's home address and investigators followed Defendant back to that address after the controlled buy. [ECF No. 48-1 ¶ 23; ECF No. 48-3 ¶ 20]. The affidavits demonstrate that investigators corroborated the information provided by the CS through independent investigation.

With regard to the October 23 warrant application, Gillen stated that investigators had obtained GPS data showing that, while the device was installed, Defendant returned to the 75 Seymour Avenue residence each night and also after he attempted to meet the CS to obtain payment for the October 2 controlled buy. [ECF No. 48-3 ¶¶ 21, 27]. In addition, investigators observed Defendant enter the residence, drive to and from the location in the Tahoe, and return

---

[1] Defendant suggests that, because the controlled buy occurred after dark and Gillen did not specifically state that investigators had an unobstructed view of the Chevy Tahoe, it is possible that the box did not, in fact, come from Defendant's vehicle. [ECF No. 48 at 8]. The affidavits make clear, however, that investigators searched the CS's car before the controlled buy, followed the CS to the controlled buy location, and observed the controlled buy. [ECF No. 48-1 ¶¶ 20–22; ECF No. 48-3 ¶¶ 17–19]. As a result, it was reasonable for the magistrate judge to infer that the box the CS retrieved came from Defendant's car.

to that location after the October 2 controlled buy. [Id. ¶¶ 20, 27]. This evidence further corroborated the CS's information and provided additional support for a probable cause finding that evidence related to Defendant's drug trafficking could be found within the residence.

As for the CS's reliability, the CS provided information about his/her past deals with Defendant, identified the make and model of Defendant's car, and provided Defendant's telephone number and city of residence, all based on his/her personal experience with Defendant. [ECF No. 48-1 ¶ 19; ECF No. 48-3 ¶ 16]. See United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005) ("A specific, first-hand account of possible criminal activity is a hallmark of a credible tip."). In providing this information, the CS implicated him/herself in past transactions with Defendant. See [ECF No. 48-1 ¶ 19 (describing how long CS had known the Defendant, how they communicated, and how they typically transacted business)]. "When a self-incriminating statement is provided by an informant whose identity is known to the authorities, the statement is more likely to be true because of the risk inherent in making such a statement." Greenburg, 410 F.3d at 67–68. Defendant also argues that the affidavit does not contain information establishing CS's past reliability as an informant, however the First Circuit has held that "an informant's tip can establish probable cause even though the affidavit does not contain information about the informant's past reliability." Id. at 67.

As a final challenge, Defendant argues that the affidavits should have included information corroborating that Defendant "was a repeat drug distributor" and that they relied instead on only one controlled buy. [ECF No. 48 at 8]. Although evidence of multiple drug deals is not required under First Circuit precedent, there was evidence from both the CS and corroborating evidence from investigators that Defendant was more than a one-time drug trafficker. See United States v. Garcia, 983 F.2d 1160, 1167 (1st Cir. 1993) (affirming

conviction after reviewing probable cause supporting a warrant describing a single controlled buy). The affidavits included information—both from the CS and investigators—supporting the contention that Defendant was not a one-time dealer. First, the CS described past transactions and the fact that Defendant would "typically 'front[]' CS the drugs" and that CS would then "pay[] [Defendant] back at a later date." [ECF No. 48-1 ¶ 19; ECF No. 48-3 ¶ 16]. Investigators observed and listened in on a conversation between the CS and Defendant, during which the CS said that he/she needed to "re-up"—in other words, get *another* supply of drugs from Defendant. [ECF No. 48-1 ¶ 19; ECF No. 48-3 ¶ 17]. Investigators also listened in on and observed the controlled buy, during which no payment was exchanged, corroborating CS's information that he/she and Defendant usually (i.e., on past occasions) arranged payment at a later time. [ECF No. 48-1 ¶¶ 21–22; ECF No. 48-3 ¶¶ 18–19, 21].[2]

In reviewing the totality of the circumstances, there was ample support for the magistrate judge's finding that both warrants were supported by credible information that had been confirmed and corroborated by investigators. See Bregu, 948 F.3d at 417.

### B.    October 23 Affidavit and Nexus

Courts "evaluate the nexus element in the familiar way, examining 'whether, given all the circumstances set forth in the affidavit . . . there [was] a fair probability that contraband or

---

[2] The Court notes that the facts here are distinguishable from the case cited by Defendant, United States v. Khounsavanh, in which the First Circuit declined to adopt a per se rule that a single controlled buy was sufficient to support probable cause. 113 F.3d 279, 285 (1st Cir. 1997); [ECF No. 54 at 6]. As the First Circuit noted, "a probable cause determination is fundamentally a fact-specific inquiry. No one factor possesses talismanic powers." Khounsavanh, 113 F.3d at 285. Here, a single controlled buy was not the only information provided in support of the affidavits. Instead, investigators provided information from a CS as well as their own observations of Defendant's activities, providing multiple touchpoints in support of the probable cause finding.

9

evidence of a crime [would] be found in a particular place.'" Bregu, 948 F.3d at 417 (alterations in original) (quoting Gates, 462 U.S. at 238).

> With regard to the 'nexus' element, . . . 'a magistrate has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'

Rodrigue, 560 F.3d at 33 (quoting Ribeiro, 397 F.3d at 49). "Put differently, the application must give someone of 'reasonable caution' reason to believe that evidence of a crime will be found at the place to be searched." Id. (quoting Ribeiro, 397 F.3d at 49).

Here, Gillen presented sufficient evidence of a nexus between the drug sales and the location to be searched, 75 Seymour Avenue, to establish probable cause that evidence related to the drug sales would be located there. First, the affidavit referenced GPS data showing that Defendant returned to the 75 Seymour Avenue residence each night and that Defendant returned to the residence after attempting to meet the CS to obtain payment for the October 2 controlled buy, while investigators had observed him entering the residence and also saw him return to that location after the October 2 controlled buy. [ECF No. 48-3 ¶¶ 20–21, 27]. In addition to this information, which directly linked Defendant to 75 Seymour Avenue in connection with drug transactions, Gillen referenced her training and experience in stating that "it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences" and that she had participated in several searches of the residences of traffickers' whose activity was similar to Defendant's where evidence of drug trafficking had been found. [Id. ¶ 23]. The magistrate judge was entitled to credit Gillen's observations as the First Circuit recognizes that "a law enforcement officer's training and experience may yield insights that support a probable cause determination." United States v. Bain, 874 F.3d 1, 23 (1st Cir. 2017) (quoting United States v. Floyd, 740 F.3d 22, 35 (1st Cir. 2014)).

10

"The nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime] . . . .'" United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999) (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)). In this case, the magistrate judge properly inferred from Gillen's descriptions of Defendant's behavior and Gillen's prior experience that there was a "fair probability" that evidence related to drug sales could be found at 75 Seymour Avenue. See United States v. Roman, 942 F.3d 43, 52 (1st Cir. 2019) (stating that observation of a defendant "mov[ing] back and forth from his residence in relation to drug transactions" could "permit an inference of nexus to a defendant's residence"); United States v. Dixon, 787 F.3d 55, 60 (1st Cir. 2015) ("In drug cases, there is often probable cause to believe that evidence of the crime will be found where the suspected drug dealer lives, at least where, as here, '[n]o other residence or drug-dealing headquarters of [the defendant's has been] identified.'" (quoting Feliz, 182 F.3d at 88)); United States v. Barnes, 492 F.3d 33, 37 (1st Cir. 2007) ("[W]hen a defendant sells drugs outside his home, it is reasonable to conclude that there is evidence of his drug dealing activity in the home . . . ."). The nexus element was therefore met and, under the totality of the circumstances, the magistrate judge's finding of probable cause was properly supported by the October 23 affidavit.

### C.   Good Faith Exception

Even if the Court were to conclude that the warrants were issued without probable cause, the Defendant's motion would fail to overcome the "good faith exception." The Supreme Court has held that suppression is inappropriate where, as here, officers' good faith reliance on a warrant is reasonable. United States v. Leon, 468 U.S. 897, 922 (1984). Assuming, *arguendo*,

that the warrants at issue did not demonstrate probable cause, the fruits of the searches would still be admissible because the warrants were not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610–11 (1975)).

## IV. CONCLUSION

Accordingly, Defendant's motion to suppress, [ECF No. 48], is DENIED.

**SO ORDERED.**

August 28, 2020 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE